EDWIN R. SAXTON v. MICHAEL F. HARRINGTON.

FILED SEPTEMBER 22, 1897.   No. 7444.

1. **Attorney and Client:** ACTION FOR FEES: EMPLOYMENT: EVIDENCE. Where it is sought to hold liable a party for attorney's fees earned in the foreclosure of a mortgage held by such party, and the employment of the attorney is dependent on whether or not one who had authorized the commencement of such foreclosure proceedings did so with authority from the mortgagee, the burden of proof is on the attorney to establish such authority, and evidence which tends to negative the existence of such authority in the alleged agent is admissible, under proper pleadings.

2. ———: ———: ———: RATIFICATION: EVIDENCE. Where the attorney seeks to recover fees alleged to be due him for the foreclosure of a mortgage, and it is claimed by such attorney that the mortgagee, with knowledge of the facts, by his silence ratified the acts of such attorney while the foreclosure was progressing, and after-

wards, that the mortgagee's ratification was evidenced by his receiving the avails of the foreclosure proceedings, and the defense is that the employment of the attorney was not by the mortgagee, but by one who wished to cut out a subsequent mortgage, evidence which tends directly to establish the fact that such representations were made to the mortgagee as to the purposes of the foreclosure of his mortgage, and that the party benefited would pay the attorney's fees in such foreclosure, is competent in explanation of the failure of the mortgagee to disaffirm the foreclosure proceeding when brought to his knowledge.

ERROR from the district court of Holt county. Tried below before KINKAID, J. *Reversed.*

*R. R. Dickson* and *H. J. Harwi*, for plaintiff in error.

*N. B. Chapman* and *H. E. Murphy, contra.*

RYAN, C.

On the 22d of August, 1894, Michael F. Harrington, an attorney at law, filed his petition in the district court of Holt county, whereby he sought to recover from Edwin R. Saxton the sum of $500 and interest. There was a verdict and judgment as prayed. In his petition Mr. Harrington alleged that, at the request of said defendant, he, the said Harrington, on April 9, 1889, entered into the service of defendant and at defendant's request commenced an action in said district court in favor of said defendant against George W. Bridges and others, which suit he, the said Harrington, prosecuted to final decree and secured payment of the amount due defendant from said Bridges and others, and that the value of the said services remained wholly unpaid. As one matter of defense Mr. Saxton answered that he had never employed defendant in error, but that whatever services had been rendered by Mr. Harrington had been rendered for the aforesaid Bridges and one J. R. Johnson. The sole questions presented by the record which we deem important are, whether or not Mr. Saxton authorized, in advance, the commencement of the foreclosure proceedings, or, after

they had been commenced, whether he ratified the employment of Mr. Harrington.

The property against which this foreclosure was had was the O'Neill Roller Mills. On March 3, 1888, George W. Bridges and Henry L. Childs, the owners of the mill property, with their wives, gave two promissory notes to E. R. Saxton for the aggregate sum of $10,000, one due April 1, 1890, the other April 1, 1891. These notes were secured by a mortgage contemporaneously made on the mill property by the makers of said notes. On March 23, 1888, George W. Bridges, who had meantime become the sole owner of the mill property, executed a promissory note to John R. Johnson for the sum of $10,250, due March 22, 1890. To secure the payment of this note, Bridges and his wife on the same day mortgaged the mill property to Johnson. On August 20, 1888, G. W. Bridges executed two promissory notes to Edward P. Allis & Co.,—one due April 1, 1889, and the other due September 12, 1889,—each for the sum of $6,384.71. Of these mortgagees, E. R. Saxton resided in Pennsylvania, John R. Johnson resided in Crete, Nebraska, and Edward P. Allis & Co. was a firm doing business in Wisconsin. At the time the foreclosure proceedings were begun, W. H. Bridges, a brother of G. W. Bridges, was in possession and control of the mortgaged property as lessee. His deposition was taken in this case, and his testimony was to the effect that at the time of the foreclosure there was no interest due on the notes secured by the mortgage to Saxton but there was due unpaid interest on the other notes. This witness said he was acquainted with Mr. Palmenteer, the president of the First National Bank of O'Neill, who represented that he was Mr. Saxton's agent for loaning money and collecting interest on the same. As to whether Mr. Palmenteer's assumption of power to act was with reference to the foreclosure, W. A. Bridges testified that he did not represent that he was authorized so to act, but he did act, as a matter of fact. W. A. Bridges thus described the history of the commencement

of the foreclosure proceedings upon which Mr. Harrington, in this action, founds his claim that he should be paid by Mr. Saxton: "At the time this action was begun to foreclose these mortgages there was a large amount of interest due and unpaid on the second mortgage of J. R. Johnson. Mr. Johnson was anxious to receive what was due and authorized me to employ an attorney to foreclose his mortgage. I employed M. F. Harrington, the plaintiff in this case, as such attorney, and together we went to the office of Mr. Palmenteer to see what would be done with regard to the first mortgage. Mr. Palmenteer and Mr. Harrington decided that the best way would be to foreclose under the first mortgage and let the other mortgagees appear as answering defendants. It was done in this way and Mr. Harrington appeared for both Mr. Saxton and J. R. Johnson. * * * I settled with Mr. Harrington all the fee he asked, which was twenty dollars. Q. Was there anything said by M. F. Harrington at the time you paid him the fee, or at any other time pending the foreclosure, about his charging E. R. Saxton any fee, and if so, what was said? A. Nothing was ever said to me at that time, or at any other time, by Mr. Harrington about his charging Mr. Saxton any fee in this case for his foreclosure." Mr. Harrington testified that he was employed by Mr. Palmenteer to begin the foreclosure proceedings above described. Mr. Palmenteer, by his deposition taken in California, gave the following testimony: "Mr. Edward R. Saxton made a loan to Mr. Bridges and Childs for $10,000 on the mill property situated in O'Neill, Holt county, Nebraska. Said loan was also secured by insurance signed over to E. R. Saxton before the loan became due. The mill was shut down for a time. During that time Mr. Saxton told me that he had been notified that the insurance had been canceled, and he was alarmed about his security and was afraid it was insufficient, and if Mr. Bridges and Childs would not have some insurance taken out in his favor he would want his mortgage foreclosed. When I went to O'Neill,

Nebraska, I went and saw Mr. Bridges and tried to get him to take out some insurance to satisfy Mr. Saxton. This Mr. Bridges refused to do. I so notified Mr. Saxton and he forwarded the notes of Mr. Bridges and Childs to the First National Bank of O'Neill, Nebraska, and they were delivered to Mr. Harrington (I think by Mr. Kelly, cashier) to foreclose. Mr. Harrington was never paid anything by me for Mr. Saxton for his services in foreclosing this mortgage. Neither did Mr. Harrington receive anything, to my knowledge, for foreclosing this mortgage."

The petition for this foreclosure was filed April 9, 1889. It would naturally be inferred from the above testimony, unexplained, that the demand for insurance, the refusal thereof, and the notice of that refusal to Mr. Saxton, immediately preceded his forwarding the notes for foreclosure proceedings and probably induced him to authorize proceedings to be instituted. Mr. Saxton testified that he did not authorize a foreclosure; that the first he knew that there was a foreclosure was by seeing a notice of it in the newspaper published at O'Neill. Mr. Saxton testified as to the interview between Mr. Palmenteer and himself as follows: "Mr. Palmenteer came there, I think it was about the first of June, and I mentioned to him that I had seen it in the paper that the foreclosure was going on and asked him how it was done; that no interest or principal was due me—the interest was paid a month before it was due—and he said that he held back the coupons due April 1, 1889, and that Bridges wanted to have it foreclosed to cut Mr. E. P. Allis & Co. out." Immediately after the above testimony the bill of exceptions states that the following proceedings were had: "Q. What was said by Mr. Palmenteer as to who should pay the expenses of the foreclosure? (Objected to as incompetent, irrelevant, and immaterial, and no such issue here,—It would have to be pleaded in the answer here. Sustained. Defendant excepts. The defendant here offers to prove by the witness on the stand that at this con-

versation down in Pennsylvania that Mr. Palmenteer informed the defendant Saxton at that time that the foreclosure was being conducted at the expense and suggestion of Mr. Bridges who was acting for Mr. Johnson, and that Mr. Bridges was to be at all the expense connected therewith, including costs and attorney fees, and to that end asks the witness the following question:) Q. You may state, Mr. Saxton, what, if anything, was said at that conversation between Mr. Palmenteer and yourself as to who was to pay the expenses of this foreclosure? (Objected to as incompetent, irrelevant, and immaterial, leading, and suggestive, and not binding on plaintiff. Sustained, and defendant excepts.)" There was presented the question of the admissibility of evidence of this same character by the refusal of the court to permit to be read certain letters written by Mr. Palmenteer to Mr. Saxton before the foreclosure proceedings were begun. The earliest written of these letters was dated February 25, 1889, and is evidently one of those referred to by Mr. Palmenteer in his deposition. After the date the following is a copy of this letter:

"*E. R. Saxton, Esq.*—DEAR SIR: I have been waiting to see Bridges. He came back home last night. In reference to the mill, it is like this: Your mortgage of $10,000 first, then J. R. Johnson, who is a brother-in-law of Bridges, has $10,250 second mortgage, then E. P. Allis & Co., of Minneapolis, Wis., have a $12,500 third mortgage, so the mill is now mortgaged for over $32,000. I had a talk with Bridges and he says if this first mortgage is left alone he will pay it off, or, if it is sold, of course they will have to bid it off, and they claim they want to shut off the third mortgage. The mill is where there is not a bit of danger, in my opinion, of catching fire, and the companies would not insure unless the mill was running, and grain has all been marketed, and Bridges tells me they don't want to start the mill until next harvest, although there are stock companies that will insure the mill. If you say so we will try and get it insured, but I

don't think there is any more danger of the mill burning than there is of Robert Wormald's brick smoke-stack at the chemical works."

Two days after the date of the above letter there was written another by Mr. Palmenteer to Mr. Saxton in which there was this language: "Bridges just told me to send to you for the coupons on your mortgage and he would be ready to pay them off when they get here providing you would allow the ten per cent for the time they run before due." This letter was excluded when offered in evidence, as also was another in which the following language had been written by Palmenteer to Saxton on March 4, 1889: "Herewith I hand you a draft for $495.83 to pay int. * * * which would be $4.17." The grounds on which these letters were held inadmissible are sufficiently described by the following objection, which was sustained, to one of them by the court: "Objected to as incompetent, irrelevant, and immaterial; and furthermore that there is no pretense here that Palmenteer was the agent of Mr. Harrington, but it is shown that he was the agent of Mr. Saxton and can in no way possibly bind the plaintiff." The theory of the court with reference to the offer to prove Mr. Palmenteer's explanation to Saxton that the foreclosure of the mortgage held by Saxton was being conducted at the expense of Mr. Bridges, acting for Johnson, who was to pay all necessary expenses, including attorney's fees, seems to have been that this evidence was incompetent because, in so far as it affected the rights of Harrington, it was mere hearsay. The same view seems to have been entertained with reference to the letters, and accordingly all this evidence was excluded from the consideration of the jury. The employment of Mr. Harrington by virtue of which it is sought to hold Mr. Saxton responsible for the foreclosure fees was by Mr. Palmenteer, as the agent of Mr. Saxton. There was no proof or pretense of a general agency. There was evidence tending to show that the First National Bank of O'Neill, of which Mr. Palmenteer

was president, was the agent of Mr. Saxton in the col-
lection of coupons due him when they matured.    The
coupons which would have fallen due April 1, 1889, were
paid before March 4, 1889.    The foreclosure was begun
April 9, 1889, when solely by virtue of his position as
president of the First National Bank, and of its limited
authority to collect and remit the proceeds of coupons as
they fell due, Mr. Palmenteer impliedly had no power to
authorize the commencement of an action.    The special
authority to employ counsel to foreclose the mortgage
of Mr. Saxton was therefore a fact proposition which
Mr. Harrington must establish to entitle him to recover
as against Mr. Saxton.    It would ordinarily be a justi-
fiable assumption, in the absence of explanatory proof
to the contrary, that, as the foreclosure was allowed by
Mr. Saxton to proceed in his name, and as Mr. Saxton
reaped the benefit of such foreclosure, he should pay for
it.    The rejected proof by the proffered letters disclosed
the fact that the testimony of Mr. Palmenteer might
have been misleading, which in close connection both in
time and dependence upon each other, grouped the de-
mand of Bridges for insurance, his refusal, the notice of
that refusal to Mr. Saxton, and Mr. Saxton's forwarding
of the notes to the bank.    The letter which advised of
the result of the demand to reinsure was written on
February 25, 1889, and the foreclosure proceeding was
begun on April 9, immediately thereafter.    In this letter
Mr. Palmenteer strongly advised against Mr. Saxton's
insistence on reinsurance, and yet, in the petition for fore-
closure, the failure to insure was the only ground truth-
fully stated as furnishing a pretense for foreclosing on
Mr. Saxton's mortgage before the note which it secured
by its terms fell due.    It seems to us that these letters
should have been admitted in evidence as tending to show
that Mr. Palmenteer, in April, had no authority to act for
Mr. Saxton in the commencement of foreclosure proceed-
ings.    The proffered evidence of the representations of
Mr. Palmenteer to Mr. Saxton after the foreclosure pro-

ceedings were begun was rejected because it was with reference to a conversation between Mr. Saxton and Mr. Palmenteer who, as it was claimed, was Mr. Saxton's agent. But the question which was being litigated was whether or not that relation in fact existed with relation to the subject-matter of this action. To shut out all the evidence which tended to show that Mr. Palmenteer was not the agent of Mr. Saxton with reference to matter now in dispute, on the assumption that such agency in fact existed, was to beg the only contested question in the case. Mr. Harrington did not claim to have acted on the assumption that Mr. Palmenteer was the agent of Mr. Saxton by reason of anything said to him by Mr. Saxton. Mr. Harrington undertook to show, as an independent fact, the extent of the special agency of Mr. Palmenteer. If, as Mr. Saxton claimed, the use made of the first mortgage on the premises was solely to enable Mr. Bridges and his brother-in-law to "freeze out" the third mortgage, Mr. Harrington could only look to the parties interested in the success of this plan for his compensation in carrying it out. If, in pursuance of such plan, Mr. Harrington and Mr. Bridges arranged with Mr. Palmenteer for him to allow a foreclosure to be brought on the notes made to Saxton, but entrusted to Mr. Palmenteer for a different purpose, this alone would not entitle Mr. Harrington to look to Mr. Saxton for his compensation. For that he must look to the party for whom he rendered the service in question. In the nature of the case it was probable that no one but Mr. Palmenteer and Mr. Saxton could testify as to the nature and extent of the agency of the former for the latter. Mr. Palmenteer's deposition might be construed as indicating that Mr. Saxton gave special authority to commence foreclosure proceedings immediately upon being informed by Palmenteer that Mr. Bridges refused to reinsure the mortgaged property. The correspondence which Mr. Palmenteer's evidence possibly assumed was sufficient to justify the inference of authority to cause to be begun foreclosure proceedings,

should therefore have been admitted in evidence, for it was the best evidence on that point. If Mr. Harrington was induced to begin foreclosure proceedings without authority from Saxton there could be no recovery for attorneys' fees, if there was no sufficient proof of ratification by Mr. Saxton of the employment of Mr. Harrington. As we have already intimated, the fact that the foreclosure went through its regular stages, and that Mr. Saxton was benefited thereby, was evidence tending to show a ratification. The proofs offered and rejected, however, tended to show that Mr. Saxton was induced to forbear interfering with the pending proceedings for foreclosure by the representation of Mr. Palmenteer that the foreclosure was for the benefit of Mr. Johnson, by whom, or by Mr. Bridges, the attorney fees were to be paid. The sufficiency of this explanation was a question of fact solely for the jury. If Mr. Saxton's theory was adopted as correct in fact, he was entitled to a verdict. The evidence rejected tended to establish this theory. Its rejection was, therefore, erroneous, and the judgment of the district court is therefore reversed.

REVERSED AND REMANDED.

HARRISON, J., not sitting.